NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0428n.06
Filed: June 22, 2006

No. 05-5009

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MORTON WU,                 )
                                      )
       Plaintiff-Appellant,       )
                                      )    ON APPEAL FROM THE UNITED
v.                                 )    STATES DISTRICT COURT FOR THE
                                      )    MIDDLE DISTRICT OF TENNESSEE
TYSON FOODS, INC.,        )
                                        )
       Defendant-Appellee.       )
                                        )    OPINION

**Before: GILMAN and GRIFFIN, Circuit Judges; and DUGGAN, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge**. Morton Wu sued his employer, Tyson Foods, Inc., for alleged acts of national-origin discrimination, race discrimination, and retaliation under Title VII of the Civil Rights Act and under various provisions of Tennessee statutory and common law. The district court granted judgment as a matter of law in favor of Tyson on most of Wu's claims, holding that they were time barred. A jury returned a verdict in favor of Tyson on the remaining claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

---

[*]The Honorable Patrick J. Duggan, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

Wu began working for Tyson in August of 1997 as a Quality Assurance (QA) trainee in the company's International Department. Tyson, which is based in Springdale, Arkansas, was planning at the time to open chicken processing plants in mainland China and had hired Wu, an American citizen of Chinese origin, to work in China following the opening of the plants. Wu trained for six months at Tyson's corporate headquarters in Arkansas before embarking on a trip to three plants in Hong Kong. Tyson did not own or operate any of the three plants. It was instead associated with two of them under a cooperation contract and with the third pursuant to a joint-venture agreement.

The parties dispute exactly what occurred during Wu's visit to the three plants. Wu contends that he discovered serious health and regulatory violations at the plants, reported those violations in writing, and thereby incurred the wrath of his superiors. The company's disappointment with his reports, Wu insists, led to his being removed from his post as a QA representative in the International Department. Tyson tells a different version of the story, maintaining that Wu accused a company associated with one of Tyson's Chinese trading partners of cheating Tyson. This incident purportedly embarrassed Tyson and prompted Tyson officials to question Wu's fitness as a QA representative. Tyson also maintains that Wu was not reassigned for this reason, and that the actual reason for his removal from that post was the company's decision to postpone its plan to open plants in China.

Whatever the reason for the employment action, the parties agree that Wu's stint in China ended in December of 1998, and that he was transferred back to Tyson's headquarters in Arkansas to work as a Quality Assurance/Hazard Analysis and Critical Control Point (QA/HACCP) Auditor. This transfer elevated Wu's salary from $33,000 to $55,000 per year. He worked as a QA/HACCP

Auditor until May of 2001, when his supervisor, Dr. Richard Roop, informed Wu that his position had been eliminated as a result of corporate downsizing. Despite the elimination of his position, Wu continued to work at the Springdale facility, with permission from Roop, while he searched for another job both within Tyson and elsewhere.

Wu obtained a position as the Evisceration Department Supervisor at Tyson's plant in Shelbyville, Tennessee three months later. According to Wu, his supervisor began harassing him during his first day on the job, comparing Wu to either a "dying chick" or a "dying Chink." These incidents were not reported by Wu until November of 2001. In the meantime, problems began to arise on the portion of the production line under Wu's supervision. Inspectors from the United States Department of Agriculture brought some of these problems to Tyson's attention in October of 2001, leading the company to first warn Wu verbally and later to issue a written reprimand. On November 9, 2001, Wu was suspended after two additional problems arose on his portion of the production line. His employment was finally terminated on November 16, 2001.

**B.      Procedural background**

In January of 2002, Wu filed a charge of discrimination with the EEOC. He filed his complaint in the district court on August 26, 2002, and later submitted a Supplemental First Amended Complaint. The latter complaint alleged (1) race and national-origin discrimination under Title VII and the Tennessee Human Rights Act (THRA), (2) hostile-work-environment discrimination under Title VII and the THRA, (3) wrongful discharge under Title VII and the THRA, and (4) retaliatory discharge under Tennessee statutory and common law. Tyson filed a

motion for summary judgment on all of the claims, which the district court denied in August of 2004.

The case then proceeded to trial in October of 2004. At the trial, Wu testified on his own behalf, and his attorney introduced documentary evidence in support of his allegations. Tyson moved for judgment as a matter of law at the conclusion of Wu's proof, arguing that Wu had failed to meet his burden as to any of the claims alleged in his complaint and that most of his claims were barred by the applicable federal and state statutes of limitations.

The district court granted Tyson's motion in part, ruling that Wu's federal and state-law claims stemming from the 1998 transfer and the May 2001 downsizing were time barred. Only the claims arising from Wu's employment at the Shelbyville plant between August and November of 2001 were submitted to the jury. Tyson then presented its case, which included testimony from three employees at the Shebyville plant during Wu's tenure: Plant Manager Tom McCue, Superintendent Tim Henson, and Complex Personnel Manager Jon Wildfish. The jury returned a verdict in favor of Tyson on the remaining claims, and the district court denied Wu's motion for a new trial. This timely appeal followed.

## II. ANALYSIS

A.    **Standard of review**

We review de novo the grant of a motion for judgment as a matter of law, applying the same legal standard as did the district court. *Sharpe v. Cureton*, 319 F.3d 259, 265-66 (6th Cir. 2003). Such a motion should be granted "only if 'in viewing the evidence in the light most favorable to the

non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'" *Id.* at 266 (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 598 (6th Cir. 2001)).

**B.      The continuing-violation doctrine**

Wu's appellate brief focuses exclusively on the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), a case that he says is not "merely illuminating or instructive," but "is dispositive." We agree with Wu that *Morgan* controls the outcome of the present case, although not in the way urged by Wu. The *Morgan* decision compels the conclusion that the district court was correct in refusing to apply the continuing-violation doctrine to any of Wu's claims. Nevertheless, the court erred in dismissing as untimely the claim that Wu was unlawfully removed from his position in May of 2001.

At issue in *Morgan* was "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside" the 300-day limitation period for filing a charge with the EEOC. *Morgan*, 536 U.S. at 105. The Court provided a different answer for the two types of actions that can be brought under Title VII: one alleging "discrete discriminatory acts" and the other alleging "hostile work environment claims." *Id.* at 110. Included in the former category are "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," each of which "starts a new clock for filing charges alleging that act." *Id.* at 113-14. Hostile work environment claims, on other hand, "involve[] repeated conduct" and require a victim to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Id.* at 115-16 (citations and quotation marks omitted). Under this latter theory, discriminatory acts that contribute to the hostile nature of the work environment but that fall outside of the limitations period may still be considered in determining liability so long as other actionable conduct occurs within that period. *See id.* at 118.

Wu's argument falters because he fails to recognize that the claims deemed untimely by the district court alleged "discrete discriminatory acts." *See Morgan*, 536 U.S. at 110. Specifically, the federal and state-law claims that the district court found untimely were based on Wu's transfer from China back to Arkansas in December of 1998 and the elimination of his post at the Arkansas facility in May of 2001. These acts are directly analogous to the nonexhaustive list provided by the Court in *Morgan*. *See id.* at 114 (listing "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of discrete acts). Because the adverse employment actions alleged by Wu constitute discrete acts, he was required to file a charge with the EEOC "within the . . . 300-day time period after the discrete discriminatory act occurred." *Id.* at 113. But Wu did not file the required charge with the EEOC until January of 2002, over three years after he was removed from his trainee position in China. The district court therefore correctly concluded that any claims stemming from the 1998 employment action were untimely.

Wu also looks for support in this court's pre-*Morgan* decision in *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1991) (setting forth "two categories of narrowly limited exceptions to the usual rule that statutes of limitations . . . are triggered at the time the alleged discriminatory act occurred") (citation and quotation marks omitted). He contends that, notwithstanding *Morgan*,

"*Dixon* is still good law." But this court's decision in *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003), squarely refutes that contention.

In *Sharpe*, this court directly addressed the continuing validity of the two categories set forth in *Dixon* in the wake of the *Morgan* decision. As to the first *Dixon* category—"[t]he serial violations component of the continuing violations doctrine"—the *Sharpe* court concluded that the category was "analogous" to the Ninth Circuit rule that the Supreme Court had invalidated in *Morgan*. *Id.* The *Sharpe* court continued:

> Accordingly, *Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period.

*Id.* On the other hand, the second *Dixon* category survives *Morgan*. *See id.* (holding that the second *Dixon* category "is not implicated by *Morgan*"). This second exception requires the plaintiff to show that the employer had a longstanding and demonstrable policy of discrimination against the class of which the plaintiff is a part. *See Dixon*, 928 F.2d at 216-17.

Wu, however, has failed to make the showing necessary to bring his case under the narrow second category of the continuing-violation doctrine. "To establish this category of continuing violation, [Wu] must demonstrate something more than the existence of discriminatory treatment in his case." *Sharpe*, 319 F.3d at 268 (citation and quotation marks omitted). He must instead introduce evidence that proves "that some form of intentional discrimination against the class of which [he] was a member was the company's standard operating procedure." *Id.* (citation and quotation marks omitted). Even assuming that the adverse employment action in December of 1998

was itself discriminatory, nothing in the record indicates that discriminating against employees of Chinese or Asian origin was Tyson's "standard operating procedure." *See id.* Tyson was therefore entitled to judgment as a matter of law on all claims arising from the 1998 action.

As the above discussion makes clear, however, the district court erred in finding untimely the Title VII claims arising from the elimination of his position as part of a corporate downsizing in May of 2001. *See Morgan*, 536 U.S. at 113 (explaining that employees are not barred "from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed"). Wu filed a charge of discrimination with the EEOC in January of 2002, well within the 300-day statutory period identified in *Morgan*.

Tyson conceded this point in its brief, but urged affirmance on the alternative ground that Wu failed to carry his ultimate burden of proving that the elimination of his position in May of 2001 was discriminatory. At oral argument, however, Tyson insisted that the district court, in announcing the dismissal of many of Wu's claims, had actually adopted Tyson's alternative argument and ruled directly on the merits of the suit. We do not believe that the transcript can fairly be read as granting Tyson's motion on any ground other than the untimeliness of Wu's claims. But because we can affirm the district court on any ground supported by the record, we will proceed to address Tyson's contention that no reasonable juror could have found that the adverse employment action suffered by Wu in May 2001 was discriminatory. *See Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004) (applying, in a Title VII case alleging national-origin discrimination, the rule that this court "may affirm the judgment of the district court on any grounds supported by the record, even if they are different from those relied upon by the district court") (citation and quotation marks omitted).

**C.    Tyson is entitled to judgment as a matter of law on Wu's claim of discriminatory treatment in May of 2001**

Tyson maintains in its brief that Wu failed to prove at trial that Tyson's decision to eliminate his QA/HACCP position in May of 2001 was discriminatory. In making this argument, Tyson first contends that Wu did not make out a prima facie case of discrimination. Wu's purported failure to establish the four elements of his prima facie case, however, is not dispositive after a trial on the merits. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("When entertaining a motion for judgment as a matter of law following a trial on the merits in a Title VII case, 'a reviewing court should not focus on the elements of the prima facie case but should assess the ultimate question of discrimination.'") (quoting *Gray v. Toshiba Am. Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir. 2001)) (citation omitted).

At the same time, an appellate court is not prevented "from considering evidence that also bears on th[e] prima facie case as long as it does so in order to address the ultimate question of discrimination." *Noble*, 391 F.3d at 727 (citation and quotation marks omitted). Because the district court held that Wu had offered proof "sufficient to establish a prima facie showing of liability under Title VII" when it denied Tyson's motion for summary judgment, we must now decide whether Wu carried his overall burden of persuasion on the issue of intentional discrimination. *See id.* at 721 (holding that, after a full trial, this court is "not permitted to decide whether the district court erred in holding that [the employee] made out a prima facie case," but must instead focus on the ultimate question of intentional discrimination).

Assuming that Wu made out a prima facie case, Tyson maintains that he failed to rebut the company's legitimate, nondiscriminatory reason for eliminating Wu's position as part of a corporate downsizing. To rebut this legitimate motive, Wu introduced a newspaper article dated June 5, 2001—approximately two weeks after he was informed that his position was eliminated—that describes the groundbreaking of a new corporate laboratory. This article, according to Wu, shows that Tyson was actually *expanding* its operations at the time that it claimed to be *downsizing*, and would therefore permit a jury to conclude that the downsizing justification was pretextual. *See Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (establishing the three ways in which an employee can demonstrate that an employer's claimed justification was in fact pretextual).

But as Wu acknowledged on cross-examination, Tyson's new lab was not scheduled to open until approximately 15 months after his position as QA/HACCP Auditor was eliminated, and in fact took 24 months to complete. Furthermore, Wu introduced no evidence to refute the fact that Tyson reduced the number of employees in the auditor position that Wu had occupied. All of this is to say that no reasonable juror would have accepted the newspaper article as sufficient evidence to demonstrate pretext.

The above analysis unquestionably overlaps to some extent with the fourth prong of the Title VII prima facie case, under which Wu would have had to show that his "position remained open" after his discharge, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), or at a minimum that Tyson singled him out "for discharge for impermissible reasons." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999) (explaining that the fourth prong of the prima facie

case is modified when the employee is dismissed due to a reduction-in-force "because in a reduction-of-force situation the plaintiff is not in fact replaced") (citation and quotation marks omitted).  As mentioned above, however, Wu provided no proof to refute Tyson's submission that his position as QA/HACCP auditor was eliminated altogether.

This failure of proof, when combined with the minimal evidence of pretext offered at trial, would not have permitted "the factfinder [to] *believe* the plaintiff's explanation of intentional discrimination."  *See Gray*, 263 F.3d at 599 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in original).  We therefore affirm the district court's grant of judgment as a matter of law on the May 2001 national-origin-discrimination claim on the alternative ground that Wu failed to produce evidence from which a reasonable juror could have concluded that his position was eliminated for that reason.  *See* 42 U.S.C. § 2000e-2(a)(1) (declaring unlawful employment decisions that are made "because of [an] individual's . . . national origin").

**D.     Wu has waived all other challenges to the dismissal of his claims**

This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.  *See Caudill v. Hollan*, 431 F.3d 900, 915 n.13 (6th Cir. 2005) (citing recent cases that stand for these two related propositions).  Although Tyson preemptively responds in its brief to a number of arguments that Wu could have made, Wu simply did not make any of those arguments.  Wu did not, as Tyson does, separate out each federal and state claim and explain the propriety (or impropriety) of the district court's ruling as to each of them.

Before this court, Wu presents only the contention that "[t]he District Judge's decision was based on an erroneous view of the law of 'continuing violation.' This decision was reversible error." The remaining pages of his brief proceed to make the arguments discussed in Part II.B. above. In addition, no argument is made regarding the issues decided by the jury. We therefore decline to address the issues preemptively briefed by Tyson. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (declaring an argument waived where the plaintiff had "wholly fail[ed] to address th[e] issue in her appellate brief") (citation and quotation marks omitted). By failing to raise any specific challenges to the district court's decision other than the application of the continuing-violation doctrine, Wu has waived those challenges. *See id.*

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.