NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0602n.06

No. 12-4235

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MAIN KH AL QUDAH,   )
                    )
    Petitioner,   )
                    )
v.                  )
                    )
ERIC R. HOLDER, JR., Attorney General,   )   ON APPEAL FROM THE
                    )   BOARD OF IMMIGRATION
    Respondent.   )   APPEALS
                    )

**FILED**
*Jun 25, 2013*
DEBORAH S. HUNT, Clerk

**Before:  BOGGS and SURHEINRICH, Circuit Judges; MURPHY, District Judge.[*]**

**STEPHEN J. MURPHY, III, District Judge.** Main Al Qudah petitions for review of an order of the Board of Immigration Appeals (the "Board") denying his applications for asylum and withholding of removal. We dismiss in part for lack of jurisdiction and deny the remainder of the petition on the merits.

I.

Al Qudah, a native of Saudi Arabia and citizen of Jordan, entered the United States as a nonimmigrant religious worker on November 3, 2000. Administrative Record ("A.R.") 709, 194. His visa authorized him to remain in the United States for three years. A.R. 709. In 2003, he was granted an extension, allowing him to remain in the United States until May 13, 2004. *Id.* On May 12, 2004,

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

United States Citizenship and Immigration Services ("USCIS") denied Al Qudah's I-360 petition for special immigration status, and on January 20, 2005, USCIS denied his I-129 petition for nonimmigrant worker. *Id.* On December 28, 2005, the Department of Homeland Security initiated removal proceedings, charging Al Qudah with removability pursuant to 8 U.S.C. § 1227(a)(1)(B) for having remained in the United States beyond his authorized period of stay. *Id.* Al Qudah conceded removability, designating Jordan as his country of removal, and requested relief in the form of asylum, withholding of removal, protection under the Convention Against Torture (the "Torture Convention"), and voluntary departure. *Id.* at 156-57. On May 29, 2009, he appeared before the immigration judge and testified in support of his applications for relief.

The following facts about Al Qudah's background are taken from his testimony. *See id.* at 177-267.

Al Qudah testified that he moved with his family from Saudi Arabia to Jordan, where his parents had citizenship, when he was 14. *Id.* at 178. At age 17, he moved to Egypt for five years to attend school. *Id.* at 179-80. He returned to Jordan in 1991 and remained there until 1997 when he moved to Saudi Arabia. *Id.* at 180,193. The approximately seven-year period in Jordan after Al Qudah returned from school is at issue here.

Al Qudah testified that after he returned to Jordan in 1991, he sought employment with the government but, because of his beliefs, the government refused to hire him. *Id.* at 180, 183-84. During this time, he was giving weekly speeches and lectures at his mosque, teaching Koran, and participating in summer camps and field trips for Muslim youth. *Id.* at 181. In addition, in 1994 and 1995, he participated in peaceful demonstrations calling for the replacement of secular law in Jordan

-2-

with Islamic law. *Id.* at 182-83. He was never "officially told" that he had been rejected for any position or that he was rejected because of his beliefs, but he testified that his nonactivist colleagues, without exception, were offered government jobs while he and other activists with the same religious and political beliefs were not hired. *Id.* at 184. He testified that his siblings had difficulty finding government jobs for the same reason. *Id.* at 197-99. After failing to find a government job, Al Qudah worked in the private sector as a secretary for a few years, and then joined the International Islamic Relief Organization, where he worked for two years. *Id.* at 180-81. Finally, he sought employment abroad, and in 1997, a private school in Saudi Arabia offered him a teaching position. *Id.* at 186.

Al Qudah testified that Jordan requires citizens seeking to work abroad to apply for a certificate of good behavior from the Jordanian government, and that to obtain such a certificate a citizen must appear for an interrogation with the "central Jordanian intelligence." *Id.* at 186, 248. An officer, accompanied by a guard, conducted Al Qudah's interrogation, which lasted five hours. *Id.* at 188-89. Al Qudah testified that the officer screamed at him, used obscene language, and acted aggressively. *Id.* at 188. Neither the officer nor the guard physically harmed him or touched him, but he testified that "there was, a sort of, psychological, you know, pressure, and abuse, and threatening of being beaten, and staying for a long time in the, in the, in the interrogation." *Id.* at 189. Al Qudah testified, "that's the way they interrogate people in Jordan, unfortunately." *Id.* The officer questioned Al Qudah about his affiliations with Islamic organizations in Jordan. *Id.* at 190. In response, Al Qudah disclosed that his father (who has since passed away) and uncle were then members of the Muslim Brotherhood, "an Islamic political and social organization." *Id.* at 190-91. Al Qudah was not a member, but at his father's request, he accompanied him to speeches and lectures and made

several small donations to the organization. *Id.* At the conclusion of the interrogation, the officer told Al Qudah that he could return home. *Id.* at 192. In a matter of a "few days, or few weeks," Al Qudah received the certificate authorizing him to work abroad. *Id.* at 193.

Within two months Al Qudah left for Saudi Arabia, where he remained for three years. *Id.* He worked first as a teacher in a private school, then as a general secretary for the World Assembly of Muslim Youth, and then as a professor at a Saudi Arabian university. *Id.* at 193, 220. In 2000, at the invitation of the Islamic Society of Arlington, Texas, he came to the United States. *Id.* at 194.

Al Qudah testified that he believes that if he returns to Jordan there is a "high possibility" that he will be arrested in the airport because he has been out of the country for twelve years and because of his position as a Muslim scholar and his "history" in Jordan. *Id.* at 200. He further testified that he believes he will be discriminated against in Jordan, that it will be hard for him to find a job, and that he will possibly be subject to torture. *Id.*

The immigration judge denied Al Qudah's request for asylum because he did not file it in time. *Id.* at 139. She found Al Qudah's testimony not credible, citing "numerous inconsistencies, lack of specific testimony and detail, and lack of corroborating evidence." *Id.* at 142. The immigration judge also found that, even if Al Qudah's testimony was credible, he did not show that he was entitled to withholding of removal because he did not establish that he had been persecuted in the past or a clear probability that he will be subject to persecution upon his return to Jordan. *Id.* at 143-47. The immigration judge rejected his claim for protection under the Torture Convention, finding that he failed to show that it is more likely than not that he would be tortured if removed to

Jordan. *Id.* at 148-49. Finally, the immigration judge denied his claim for voluntary departure because Al Qudah testified that his Jordanian passport is expired. *Id.* at 149.

The Board affirmed the immigration judge's finding that Al Qudah did not timely file his asylum application. *Id.* at 2. The Board did not address the immigration judge's adverse credibility determination. Instead, the Board accepted Al Qudah's testimony as true and found that he is not eligible for withholding of removal because "the incidents that the respondent describes — including the inability to get a government job and intense interrogation when applying for a certificate to work abroad — do not constitute past persecution," and the record did not support a finding that he is more likely than not to be persecuted in the future. *Id.* at 2-3. The Board also affirmed the immigration judge's determination that Al Qudah is not eligible for protection under the Torture Convention or for voluntary departure. *Id.* at 3.

## II.

"Where the [Board] reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the [Board's] decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). To the extent the Board's decision adopts the immigration judge's reasoning, we review that portion of the immigration judge's decision. *Id.*

## III.

In his opening brief, Al Qudah presented arguments pertaining only to the denial of his applications for asylum and withholding of removal. He has therefore waived review of the Board's decisions with respect to the Torture Convention and voluntary departure. *See Wu v. Tyson Foods,*

*Inc.*, 189 F. App'x 375, 381 (6th Cir. 2006) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

A.     Asylum

The government argues that we do not have jurisdiction to review denial of Al Qudah's application for asylum. We agree.

Al Qudah arrived in the United States on November 22, 2000, but did not file his asylum application until September 13, 2006. Generally, an alien seeking asylum must apply within one year of arriving in the United States, unless he can show changed conditions affecting his eligibility for asylum or extraordinary circumstances that caused him to file late. 8 U.S.C. § 1158(a)(2). As the Board found, Al Qudah's lawful non-immigrant status is an extraordinary circumstance that excuses his failure to file within the one-year period. *See* 8 C.F.R. § 1208.4(a)(5)(iv) (providing that "extraordinary circumstances" may include maintenance of lawful nonimmigrant status). But Al Qudah was still required to file his application within a "reasonable period" after termination of his lawful status. 8 C.F.R. § 1208.4(a)(5) ("[Extraordinary] circumstances may excuse the failure to file within the 1-year period as long as the alien filed the application within a *reasonable period* given those circumstances.") (emphasis added). Noting that Al Qudah's visa expired May 13, 2004, and Al Qudah did not seek asylum until September 13, 2006, the Board determined that Al Qudah waited "more than a 'reasonable period' after the termination of his lawful status," and therefore deemed his application time barred.

This determination is not subject to our review. *See* 8 U.S.C. § 1158(a)(3) (providing that "[n]o court shall have jurisdiction to review," *inter alia*, rejection of an application as untimely).The jurisdictional bar applies "only when the appeal seeks review of discretionary or factual questions," and does not preclude our review of constitutional claims or matters of statutory construction. *Vincent v. Holder*, 632 F.3d 351, 353 (6th Cir. 2011). But Al Qudah does not raise any constitutional or statutory construction claims with respect to the timeliness of his asylum petition; he offers only an unsupported assertion that his application for asylum was filed within a reasonable time of termination of his lawful status. *See* Pet'r's Br. 18. Because we do not have jurisdiction to review the Board's determination to the contrary, we dismiss the petition for review with respect to this issue.

B.    Withholding of Removal

Al Qudah also argues that the Board wrongly denied his application for withholding of removal. We disagree.

An applicant is entitled to withholding of removal if he can demonstrate a clear probability that his life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b); *see also Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005) ("To establish a clear probability, the applicant must demonstrate that 'it is more likely than not' that he or she will be persecuted upon return."). An applicant may meet the burden by establishing that he has suffered "past persecution " in the proposed country of removal on account of one of the five listed grounds. 8 C.F.R. § 1208.16(b)(1)(i). A satisfactory showing of past persecution creates a

rebuttable presumption that the applicant's life or freedom would be threatened in the future if he were removed. *Id.* In the absence of a showing of past persecution, an applicant may still meet his burden by otherwise demonstrating that it is more likely than not that, if removed, he will be subject to persecution on account of one of the five listed grounds. 8 C.F.R. § 1208.16(b)(2).

Our review is deferential. We will reverse the Board's denial of Al Qudah's application only if it is "manifestly contrary to the law." 8 U.S.C. § 1252(b)(4)(C); *accord Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006). The Board's determination is manifestly contrary to law if the evidence "not only supports a contrary conclusion, but indeed *compels* it." *Yu v. Ashcroft*, 364 F.3d 700, 702-03 (6th Cir. 2004) (citation omitted; emphasis in original). We defer to the administrative findings of fact except when "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also* " *El Assadi v. Holder*, 418 F. App'x 484, 486 (6th Cir. 2011) ("The 'substantial evidence' standard requires us to adopt the Board's findings of fact '[u]nless any reasonable adjudicator would be compelled to conclude to the contrary.' ") (quoting *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009)).

The Board found that, even accepting Al Qudah's testimony as true, he did not establish eligibility for withholding of removal, and we agree. Al Qudah claims that he was subject to past persecution when the government refused to hire him and subjected him to an intense five-hour interrogation when he sought to leave the country to work in Saudi Arabia. But as the Board concluded, these events do not constitute persecution for the purposes of withholding of removal.

Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty."

*Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). Evidence of physical harm is not a prerequisite to finding persecution. *Haider v. Holder*, 595 F.3d 276, 286 (6th Cir. 2010). "Persecution can include . . . economic restrictions so severe that they constitute a real threat to life or freedom." *Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citing *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir.1997)). We "must view the evidence in the aggregate, as a collection of harmful events, [that] even though they may not qualify individually as persecution, may taken together constitute persecution." *Haider*, 595 F.3d at 287 (alteration added, quotation marks and alteration omitted). An applicant must show that he was "specifically targeted" and was not "merely a victim of indiscriminate mistreatment." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005).

As the Board found, the alleged five-hour interrogation does not constitute persecution because according to Al Qudah's testimony, he was not specifically targeted for interrogation or interrogated harshly because of his particular beliefs: he testified that all citizens who seek to work abroad must obtain a certificate of good behavior, A.R. 186; all applicants for certificates are required to undergo interrogation, *id.* at 187, 248; and Jordan conducts all of its interrogations in the same manner, *id.* at 189. *Gilaj*, 408 F.3d at 285.

The Board also correctly found that the government's failure to offer Al Qudah a job — even if motivated by animosity toward his beliefs — did not amount to persecution. "Economic deprivation may rise to the level of persecution only when the resulting conditions are sufficiently severe that they constitute a threat to the individual's life or freedom." *El Assadi*, 418 F. App'x at 486 (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 624 n.9 (6th Cir. 2004) and *In re Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985)) (quotation marks and citation omitted). " '[A] sweeping limitation

of opportunities to continue to work in an established profession or business may amount to persecution even though the applicant could otherwise survive.' " *Stserba v. Holder*, 646 F.3d 964, 976 (6th Cir. 2011) (quoting *In re T–Z–*, 24 I. & N. Dec. 163, 174 (BIA 2007)). But the government's mere failure to hire an individual, without more, is not persecution. *See Daneshvar*, 355 F.3d at 624 (6th Cir. 2004) (declining to find persecution where "Petitioner was . . . able to obtain employment, although his options were limited by his inability to work for the government"); *see also Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (holding that applicant's complaint that "he could not get a government job commensurate with his education and training . . . did not rise to the level of persecution"). If failure to secure a government position were sufficient, "every patronage firing after every regime change in another country would establish a cognizable basis for an asylum claim in this country." *Scavenger v. Mukasey*, 313 F. App'x 816, 818 (6th Cir. 2008). Al Qudah did not testify that the government took any action to disadvantage him economically, other than failing to hire him. He was able to find work in the private sector and he does not contend that the Jordanian government interfered with his private sector employment or with his departure to work in Saudi Arabia. He testified that "[i]t was hard to stay in Jordan" and that he sought a job overseas "to take care of my family," A.R. 186, but those general statements aside, he did not testify that he faced "severe economic disadvantage" as a result of the government's failure to hire him. *See In re T-Z-*, 24 I. & N. Dec. at 171, 173 ("[U]se of the term 'severe' as the benchmark for the level of harm is consistent with the principle that persecution is an 'extreme concept that does not include every sort of treatment our society regards as offensive.' ") (citation omitted). Accordingly, his testimony describes conduct that, while it may have been discriminatory, was not persecution. *See*

*Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) ("[D]iscrimination without more does not rise to the level of persecution.") (citation omitted).

Al Qudah also argues that the Board "failed to evaluate the economic deprivation, in conjunction with the fact that the Petitioner was harshly interrogated." Pet'r's Br. 21. Although the Board did not state explicitly that the alleged economic deprivation and the interrogation would not "when taken together constitute persecution," *Haider*, 595 F.3d at 287, a review of the Board's decision reveals that it discussed and considered the evidence as a whole when making its determination, and did not improperly weigh the incidents in isolation. *See* A.R. 2-3. Moreover, because the interrogation requirement applies to all citizens who seek to work abroad, and the government ultimately granted Al Qudah's certificate, the interrogation adds little to his claim of economic deprivation. The Board reasonably determined that Al Qudah's allegations, even taken cumulatively, do not constitute persecution.

Because Al Qudah did not establish past persecution, he retained the burden to otherwise show that he will more likely than not be subject to persecution if removed to Jordan. *See* 8 C.F.R. § 1208.16(b)(2). The Board concluded that he failed to do so. Citing the United States Department of State's 2009 Human Rights Report, the Board found that "the record does not establish that Muslims who favor broader application of Islamic law are persecuted in Jordan." A.R. 3. The Board also found a lack of record evidence to support Al Qudah's claim that Jordanians who are absent from the country for a significant length of time are mistreated. *Id.* at 3. Although Al Qudah submitted evidence that prisoners in Jordan are tortured, the Board noted that Al Qudah "has not been imprisoned there and the record does not support a finding that he is more likely than not to be

imprisoned in the future." *Id.* Al Qudah does not challenge this portion of the Board's decision on appeal, but we note that it is supported by substantial evidence.

Accordingly, we find that Al Qudah did not demonstrate that it is more likely than not that he will be persecuted upon return to Jordan, and we affirm the Board's determination that Al Qudah is not entitled to withholding of removal. Because we reach this conclusion having accepted Al Qudah's testimony as true, Al Qudah's argument that the Board erred by failing to reverse the immigration judge's credibility determination is moot and we need not review it.

IV.

For the foregoing reasons, we DISMISS in part for lack of jurisdiction and DENY the remainder of the petition for review on the merits.